417 F.2d 1134
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
Ford M. MacELVAIN and Robert C. MacElvain, Individually and Doing Business as Deep Rock Drilling Company, Opelika, Alabama, Defendants-Appellants.
 No. 28094 Summary Calendar.
 United States Court of Appeals Fifth Circuit.
 November 4, 1969.
 
 J. Campbell Palmer, III, Charleston, W. Va., for defendants-appellants.
 J. Carlton Ivey, Securities and Exchange Commission, Atlanta, Philip A. Loomis, Jr., Gen. Counsel, Securities and Exchange Com., David Ferber, Sol., Paul Gonson, Asst. Gen. Counsel, Harvey L. Pitt, Atty., Washington, D. C., for plaintiff-appellee.
 Before GEWIN, DYER and CARSWELL, Circuit Judges.
 CARSWELL, Circuit Judge:
 
 
 1
 In this action, appellants Ford M. MacElvain and Robert C. MacElvain, individually and doing business as Deep Rock Drilling Company, seek reversal of an order by the United States District Court for the Middle District of Alabama permanently enjoining them from violating §§ 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e (a) and (c).[1]
 
 
 2
 In the early part of 1968, the MacElvain brothers, appellants herein, along with six others, each person having an undivided one-eighth interest, filed over 4,000 claims under the provisions of the United States Mining Claim Law of 1872 to a 500,000 acre tract of underwater grounds off the coast of Santa Barbara, California. Shortly thereafter, the United States Department of the Interior leased this land to certain oil companies.
 
 
 3
 On or about March 28, 1968, appellants started offering to the general public one-sixteenth interests in 285 of these underwater mining claims. In this first offering, it was represented that the money raised from the sale of these interests was to be used for an "expensive court fight" to validate appellants' claim to the oil. It was made clear that the "court fight" would inure to the benefit of purchasers of the claim. The offer stated, "If we are successful, each 1/16 interest should realize a payout of about 1,000-to-1. For example, a $300 interest should realize about $300,000."
 
 
 4
 On April 26, 1968, the Securities and Exchange Commission notified appellants that their initial offering appeared to be a "security" within the meaning of the Securities Act and informed them of the registration requirements of the Act. After a conference between appellants and representatives of the Commission, it was agreed by appellants that they would not continue further offerings of the mining claims in violation of federal securities laws. Shortly after this same conference, appellants wrote a letter to the chief counsel for the Commission in Washington, D. C., inquiring whether one of the several exemptions from the registration requirements of the Act was available. Without waiting for a reply to this letter, appellants began a second offering of these mining claims on May 27, 1968.
 
 
 5
 This second offer differed from the first in that appellants offered one-eighth undivided interests in lieu of one-sixteenth undivided interests, and the letter contained a paragraph disclaiming any "collateral offer, promise or assurance of any nature whatsoever." The letter, however, indicated the basis upon which title was claimed, the contested nature of the title being sold, and alluded to the necessity of litigating title. And, it was stated that "on the average, each 1/8 represents acreage that should bring a total bonus and royalty of MORE THAN $300,000!"
 
 
 6
 The Commission learned of this second offering, and a second conference was held whereupon a representative of the Commission notified appellants that it appeared that they were still offering securities, in the form of "investment contract." Appellants assured the Commission that they would make no further offerings to sell fractional interests in their claims. They contended, however, that the second offer was simply an attempt to sell real estate or a claim in real estate. The Commission requested a copy of the rescission letter which appellants claimed to have sent to the purchasers of the claims in the first offering, and instructed the appellants to send offers of rescission to purchasers of the second offering. After two months had elapsed without response from appellants, the Securities and Exchange Commission commenced this action for an injunction on October 8, 1968.
 
 
 7
 On October 31, 1968, the District Court found that both the first and second offerings were clear violations of the registration requirements of §§ 5(a) and 5(c) of the Securities Act, and a preliminary injunction was ordered. On this same date, appellants forwarded to the Court the letter which purported to rescind the first offering. No rescission letter was offered concerning the second offerings. On February 19, 1969, a hearing was had to determine whether a permanent injunction should be granted.
 
 
 8
 In its order issuing the permanent injunction, the District Judge found that nothing submitted to the court subsequent to the order preliminarily enjoining appellants suggested that his determination regarding the second offering was erroneous, nor had appellants succeeded in altering the court's conclusion that injunctive relief was appropriate. The trial judge stated that:
 
 
 9
 "Here, the defendant's first offering was concededly illegal. The Commission's efforts to deal with the problems apparent in the second offering on a voluntary and informed basis were met with equivocation and something less than full cooperation. This second offering has been subsequently ruled illegal. As the Second Circuit stated in Securities and Exchange Commission v. Culpepper, 270 F.2d 241, 250 (2nd Cir. 1959):
 
 
 10
 `Surely the Commission should not be required to keep these appellants under surveillance and to bring a subsequent action if they commence again to sell "tainted stock."'"
 
 
 11
 Appellant now brings this appeal upon three issues: (1) Was the second letter sent by appellants an investment contract under the law?; (2) Should the lower court have awarded a permanent injunction against appellants?; and (3) Were appellants' constitutional rights violated when the trial court required them to submit written answers to requests for admissions propounded by appellee and when one appellant was required to testify as an adverse witness?
 
 
 12
 An investment contract has been described in the case of Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) as:
 
 
 13
 "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * *." 328 U.S. at 298-299, 66 S.Ct. at 1103.
 
 
 14
 "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.
 
 
 15
 In light of this definition and other cases repeatedly holding that the term "security" is to be broadly construed, Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), a review of the record convinces us that the District Court correctly concluded that "the finding of an implied promise brings the second offering well within the definition of an investment contract."
 
 
 16
 Appellants rely upon their disclaimer in the second offering to the effect that no collateral promises were being made. This reliance is misplaced for the reason that the interrelationship between the two offerings cannot be ignored. Appellant Ford MacElvain testified that the second offering letter was sent along with the letter rescinding the first offer to all purchasers of claims who bought as a result of the first offer. The rescission letter itself noted that the revised offering was enclosed. The District Court did not err in its finding that the second offer impliedly, but clearly and definitely, promised the purchaser that the United States Department of the Interior's claim to the land would be contested by appellants with the money received from the purchasers, and that successful court action would inure to all purchasers. This was clearly an offer to sell an investment contract without first filing a registration statement with the Securities and Exchange Commission.
 
 
 17
 Appellants' next specification of error regarding the District Court's propriety in granting a permanent injunction is without merit. This Court has long recognized that the granting or denying of injunctive relief rests within the sound discretion of the trial court and that the exercise of this discretion will not be disturbed unless there has been a clear abuse of it. Frostie Company v. Dr. Pepper Company, 361 F.2d 124, 127 (5th Cir., 1966).[2] The District Court did not abuse this discretion when it entered a permanent injunction. The record shows that appellants have continually attempted to circumvent the registration requirements rather than comply with them. They have always maintained and continue to contend that the second offering does not involve a "security." It has been held that in a suit for injunction, a defendant's assertion of the correctness of his behavior is a ground for restraint. Walling v. Helmerick & Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29 (1944). Even had appellants complied with the Commission's requests respecting the rescission letters, rather than meeting these requests, as found by the District Court, "with equivocation and something less than full cooperation," it is established that the court's power to grant injunctive relief survives discontinuance of the illegal conduct and can even be utilized without a showing of past wrongs. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Walling v. Helmerick & Payne, Inc., supra, 323 U.S. at 43, 65 S.Ct. 11. With these principles in mind, and upon a review of the entire record, it cannot be said that the District Court abused its discretion in ordering a permanent injunction against appellants.
 
 
 18
 Finally, appellants contend that their Fifth Amendment rights were violated when the District judge required them to submit written answers to requests for admissions, and that appellant Ford MacElvain's rights were violated when he was required to take the stand as an adverse witness during the hearing. The trial court did not abuse its discretion in these matters. An injunctive action is purely a civil proceeding and, as such, the Federal Rules of Civil Procedure regarding discovery through requests for admissions (Rules 36 and 37) and calling an adverse witness to the stand (Rule 43(b)) are clearly applicable. Before testifying, appellant Ford MacElvain was warned of his constitutional right against self-incrimination. Appellant never invoked this right. Furthermore, appellant's own counsel called him to the stand in support of his defense. Thus, it cannot be claimed that appellant Ford MacElvain was prejudiced by being required to testify.
 
 
 19
 We accordingly affirm the order of the court below that appellants be permanently enjoined from violations of the registration provisions of the Securities Act.
 
 
 20
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument. Accordingly, the Clerk has been directed to place the case on Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 409 F.2d 804, Part I (5th Cir. 1969)
 
 
 [2]
 Accord United States v. Board of Education, 332 F.2d 40, 46 (5th Cir. 1964); J. M. Fields of Anderson, Inc. v. Kroger Co., 330 F.2d 686, 687 (5th Cir. 1964); United States v. Dogan, 314 F.2d 767, 772 (5th Cir. 1963); Detroit Football Co. v. Robinson, 283 F.2d 657, 659 (5th Cir. 1960); Reliable Transfer Co. v. Blanchard, 145 F.2d 551, 552 (5th Cir. 1944)