United States Court of Appeals,

Fifth Circuit.

No. 93-1715.

GREAT WESTERN DIRECTORIES, INC., Plaintiff-Appellee-Cross Appellant,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, et al., Defendants-Appellants-Cross Appellees.

CANYON DIRECTORIES, INC., Plaintiff-Appellee-Cross Appellant,

v.

SOUTHWESTERN BELL TELEPHONE COMPANY, et al., Defendants-Appellants-Cross Appellees.

Sept. 20, 1995.

Appeals from the United States District Court for the Northern District of Texas.

Before WISDOM, REYNALDO G. GARZA and GARWOOD, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

I. Summary and Procedural History

Plaintiffs-Appellees, Great Western Directories, Inc. (Great Western) and Canyon Directories, Inc. (Canyon), filed suit alleging that Defendants-Appellants, Southwestern Bell Telephone Company, et al. (collectively, "SWB"), violated Sections 1 and 2 of the Sherman Act, violated the Texas Free Enterprise and Antitrust Act, violated the Texas Deceptive Trade Practices Act, and tortiously interfered with business relations. Appellants allegedly orchestrated an "affiliation wide concerted action" to extend the SWB monopoly of the yellow pages market and to eliminate competition by raising the costs of doing business as an independent directory and by reducing

1

the price of advertising in its wholly owned classified directory by 40%.

A jury returned a verdict in favor of Great Western and Canyon. The jury found damages of $5 million on Great Western's antitrust claims, $50,000 in actual and $50,000 in additional damages on its DTPA claims, and $50,000 in actual and $50,000 in punitive damages for its tortious interference claims. The jury found damages of $9,400 on Canyon's antitrust claims, $10,000 in actual and $10,000 in additional damages under its DTPA claims, and $10,000 in actual and $10,000 in punitive damages on its tortious interference claims. Both plaintiffs were awarded attorneys' fees.

Following the verdict, Appellants moved for JNOV and for a new trial. On July 27, 1990, the district court entered judgment on the verdict, awarding Great Western $15 million and Canyon $28,200 in trebled antitrust damages and awarding both plaintiffs attorneys' fees; no damage award was made on the state law claims. On May 8, 1992, the district court held a hearing on Appellees' motion for injunctive relief and on Appellants' motions for judgment as a matter of law and new trial. On July 2, 1993, the district court entered a final judgment granting a permanent injunction and denying Appellants' post-trial motions.

On July 9, 1993, Appellants filed a motion to stay the injunction pending appeal. On July 29, 1993, Appellants filed its notice of appeal. On December 7, 1993, the district court entered its final judgment, denied Appellants' motion for stay, and refused to extend its injunction beyond the parties.

II. Parties and Subject Matter

Southwestern Bell Corporation (SWB) is a holding company; Southwestern Bell Telephone Company (Telephone), SWB's wholly owned subsidiary, provides telephone service to its customers in Arkansas, Kansas, Missouri, Oklahoma, and Texas. Telephone publishes and provides the "white pages" to its telephone customers. In order to publish the white pages Telephone must compile and maintain a database of names, addresses, and telephone numbers of all its customers. This compilation is known in the telecommunications world as directory listing information (DLI).

Southwestern Bell Yellow Pages (Yellow Pages), another wholly owned subsidiary of SWB, licenses DLI[1] from Telephone for use in publishing its classified, or yellow pages, directory. Telephone licenses DLI to independent publishers, such as Great Western and Canyon. Great Western is based in Amarillo, Texas and publishes a competing yellow pages (classified) directory in eleven cities in Texas and Oklahoma. Canyon publishes a single directory in Canyon, Texas (near Amarillo). Canyon is a "niche" publisher whose directory caters to local advertisers who do not need to advertise outside of their immediate geographic area.

III. Facts

---

[1]DLI is provided in a variety of formats. One form is known as the "book on the street" paper or "BOS-paper". BOS-paper is a published compilation of names, addresses and telephone numbers, that is, the white pages. Another format is known as "subscriber listing update service" (update service). The update service consists of two components. The first component, the "initial load", is a copy of Telephone's DLI on magnetic tape as of a given date. The second component, the "updates", is a monthly update of the initial load.

Appellants and Appellees paint distinctly different pictures of the facts in this case. However, some facts are uncontested. In June 1988 Yellow Pages improved its classified directories in certain markets and instituted a rate reduction in Amarillo. The rate reduction consisted of a 40% across-the-board reduction in advertising rates as well as various incentives enabling advertisers who maintained existing expenditure levels to receive additional advertising. Effective January 1, 1989, Telephone increased its DLI prices from $0.30 to $0.50 for the initial load, and the update to $1.00.

The incidents leading up to the rate reduction and the DLI price increase are hotly contested as are the effects. Appellants and Appellees each give their own economic explanation of the causes and effects of the changes instituted by SWB. Briefly, Appellees contend SWB adopted a strategy to eliminate the competition and slow their declining market share. This was accomplished by a two-prong attack—raising the prices and imposing restrictive conditions on the sale of the DLI, while at the same time improving the quality of telephone directories published by Yellow Pages and reducing the prices charged for the advertisements. Because Great Western operates at a low marginal profit of two percent of its sales, reflecting its emphasis on expansion, the change in DLI prices forced Great Western out of its Richardson market and prevented it from entering its Little Rock market.

Appellants, on the other hand, contend that Yellow Pages'

4

share of the advertising directory market was shrinking, and accordingly made improvements to their directories and instituted a rate reduction of 40% in Amarillo on a trial basis. Pursuant to studies conducted of DLI prices in other markets, Telephone decided to increase its DLI price. Appellees continued to compete; in fact, Appellees' revenues and market shares increased after the DLI price change. Great Western's decision to abandon Richardson and not to enter Little Rock was based on their fear that SWB would increase its DLI prices in the future.

IV. Summary of the Law

## Standard of Review

This Court reviews a district court's refusal to grant a judgment as a matter of law *de novo,* applying the same standards as the district court. The trial court, in entertaining a directed verdict, views the evidence in the light most favorable to the party against whom the motion is made. On appeal, this Court must consider the evidence in its strongest light in favor of the party against whom the motion was made, and must give him the advantage of every fair and reasonable intendment that the evidence can justify.[2] A judgment notwithstanding the verdict (JNOV) should be granted by the trial court

> only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that a reasonable juror could not arrive at a contrary verdict, [while] viewing the facts in the light most favorable to the nonmovant and giving that party the advantage of every fair and reasonable

---

[2]*Continental Ore Co. v. Union Carbide Corp.,* 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 1409, n. 6, 8 L.Ed.2d 777 (1962).

inference that the evidence justifies.[3]

Antitrust Law

Appellees raised two Section 2 claims:  monopoly and attempted monopoly.  They contend that Appellants violated Section 2 under both of these theories by abusing an essential facility and through market leveraging.  The jury returned a verdict in favor of Appellees finding that:

> (1) defendants monopolized and attempted to monopolize the alleged relevant markets for telephone directory advertising by denying reasonable access to an essential facility, that is, Telephone's DLI;

> (2) defendants monopolized the same alleged markets by leveraging monopoly power over DLI in an illegal restraint of competition in the telephone directory advertising markets; and

> (3) defendants attempted to monopolize the alleged telephone directory advertising markets by increasing the price of DLI to Yellow Pages and its competitors while at the same time substantially reducing Yellow Pages' rates for telephone directory advertising and substantially enhancing its directories.

The offense of monopoly under Section 2 consists of two elements:  (1) possession of monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power as opposed to acquiring market dominance through competitively desirable means or through events beyond its control.[4]  Monopoly power is the power to control prices or exclude competition.[5]  Several factors are

---

[3]*Spuler v. Pickar,* 958 F.2d 103, 105 (5th Cir.1992).

[4]*United States v. Grinnell Corp,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

[5]*United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956).

determinative of a finding of monopoly power: high market share,[6] affirmative actions that have excluded actual or potential competitors, profit levels, and barriers that would thwart entry.[7] It should be noted that the purpose of the market definition and market power inquiry is to determine whether an arrangement has the potential for genuine adverse affects on competition. Proof of actual detrimental effects can obviate the need for the inquiry into market power.[8]

In addition to establishing the existence of monopoly power, it must be demonstrated that the defendant "willfully" acquired or maintained its monopoly power. This involves an inquiry as to whether the defendant has acquired or exploited its monopoly power through competitively undesirable means. What are undesirable means? The responses of the courts were to distinguish between those exclusionary effects that are inherent in the forces of free competition and those that are substantially enhanced or made possible by the possession and exploitation of monopoly power. Specific intent to maintain a monopoly power is not required; however, it is relevant in determining whether the challenged conduct is exclusionary or anticompetitive.

An attempted monopoly in violation of Section 2 consists of

---

[6]*Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481-83, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992).

[7]WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK, 352-53 (1994 ed.).

[8]*FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

3 elements: (1) a showing that the defendant has engaged in predatory or anticompetitive conduct, (2) proof that the defendant specifically intended to acquire monopoly power in the relevant market, and (3) a dangerous probability that an actual monopoly position will ultimately be achieved. Predatory or anticompetitive conduct is that which unfairly tends to be exclusionary or tends to destroy competition. Specific intent is the intent to accomplish the forbidden objective, an intent that goes beyond the mere intent to do the act. Intent may be inferred by anticompetitive practices or proven by direct evidence. Dangerous probability of achieving an actual monopoly position is customarily assessed by looking at the defendant's market share. If the defendant possesses a large share, it will likely be concluded that the defendant's conduct, if undeterred, will result in an actual monopoly.[9] Control of key materials is also determinative.

V. Discussion

### Exclusionary Conduct

Appellants argue that under both a monopoly or attempted monopoly theory, Appellees must show that Appellants' conduct was improperly exclusionary, that is, that the conduct caused injury to

---

[9]*See e.g. Advanced Health Care Serv. v. Radford Comm. Hosp.,* 910 F.2d 139 (4th Cir.1990) (85 percent); *Movie 1 & 2 v. United Artists Communications, Inc.,* 909 F.2d 1245 (9th Cir.1990) (96 percent); *United States v. American Airlines, Inc.,* 743 F.2d 1114 (5th Cir.1984). In contrast, proof that the defendant's share is minimal will result in a finding that an actual monopoly is improbable. *See, e.g., Langenderfer, Inc. v. S.E. Johnson Co.,* 917 F.2d 1413 (6th Cir.1990) (30 percent declining share); *C.A.T. Industrial Disposal, Inc. v. Browning-Ferris Industries,* 884 F.2d 209 (5th Cir.1989) (10 percent market share insufficient as a matter of law).

competition.[10]  Because Canyon and Great Western continued to profit after the price increase, and because Great Western could have profitably expanded, Appellants argue there is no evidence to show that Appellants' conduct was exclusionary.  This is Appellants' main argument and it is pervasive throughout its brief.

Appellants contend that in order for Appellees to succeed under a Section 2 antitrust claim, they must present evidence of injury to competition.  This is not entirely true.  Section 2, under both a claim of monopoly and a claim of attempted monopoly, proscribes exclusionary conduct.  Injury to competition is NOT an element of Section 2.  "[P]roving an injury to competition is not an element of a monopolization-based antitrust claim."[11]  However, as a practical matter, evidence of an injury must exist if Appellees are to obtain damages.[12]  Additionally, evidence of injury to competition supports a finding of exclusionary conduct.  Nevertheless, the proper inquiry is whether Appellants engaged in exclusionary, anticompetitive, or predatory conduct.

Exclusionary conduct is conduct that tends to exclude or restrict competition and is not supported by a valid business

---

[10]Although the jury found Appellant liable under several theories of antitrust law, including monopoly, attempted monopoly, leveraging, and unreasonable denial of an essential facility;  the briefs focus on the issue of exclusionary conduct and anticompetitive effect.  Because exclusionary conduct is the linchpin in this case, we will focus upon it.

[11]*Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, 939 (5th Cir.1988).

[12]*See id.* (recognizing that Section 4 of the Clayton Act comes with a specific injury requirement).

reason. Exclusionary conduct comprehends behavior that not only tends to impair the opportunities but also does not further competition on the merits or does so in an unnecessarily restrictive way.[13] An attempt to exclude or actual exclusion is conduct based on something other than efficiency, that is, without a valid business purpose. Antitrust law does not require a plaintiff to prove that the defendant's conduct totally eliminated all competition or made it so unprofitable as to eliminate the plaintiff as a competitor. The plaintiff is required to show that a monopolist's unjust conduct handicapped its competitors.[14] It is not necessary to exclude competitors to be guilty of monopolization.[15]

Appellants' argument, that the DLI price increase had no adverse effect on competition and was not exclusionary, is not supported by the evidence taken in the light most favorable to Appellees. Appellees identify extensive evidence, if believed by the jury, that precludes a judgment as a matter of law. First, a jury could find that SWB's purpose in raising the DLI price and imposing more restrictive terms was to recapture its market share,

---

[13]*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 2859 n. 32, 86 L.Ed.2d 467 (1985).

[14]*Aspen Skiing Co.,* 472 U.S. at 605, 105 S.Ct. at 2858.

[15]*Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968); *see also Poster Exchange v. National Screen Service Corp.,* 431 F.2d 334, 339 n. 13 (5th Cir.1970) (holding that a monopolist's decision to charge retail prices to competing wholesaler was unlawful if done "to gain a competitive advantage").

to prevent expansion of current independents, and to prevent new independents from entering the market. SWB identified one of its competitive weaknesses as "low start-up costs" for independents. "Competitor's low margin and high risk strategy leaves [them] vulnerable to expense driven attacks."[16] The only cost or expense for independents that SWB controlled was the price of DLI. SWB long since recognized that DLI was "vital to the publishing industry" and "without sharing this updated information with competing directory publishers, telephone companies are able to leverage their monopoly position in the telephone service area into the competitive directory market."[17] Most telling is the evidence indicating that Kaufman, Yellow Pages' president, suggested a DLI price increase.[18] An expert of economics testified that increasing Yellow Pages' own cost of production was "economically irrational but for its anti-competitive effect [on independents]."[19] Later, Kaufman questioned why the DLI had been raised to $1.00 when it could have been even higher so that "we might [be able] to ... get

---

[16]Although the planning documents from which these quotes were taken do not specifically recommend increasing the price of DLI, a jury could easily make the inferential hop.

[17]Affidavit of former Yellow Pages President A.C. Parsons.

[18]Several individuals testified at trial that Kaufman suggested looking into DLI prices to increase Telephone's revenues.

[19]SWB argues on appeal that by passing this cost on to the independents, it can thereby reduce the amount of basic telephone service to its customers. This was argument was not presented to the jury and the district court found it meritless, as do we. We cannot say as a matter of law that this post-trial explanation accurately stated the true purpose and effect of the DLI price increase.

rid of some publishers."  A jury could find that by raising the cost of production SWB intended to "get rid of" some of the low margin competitors, and thereby, capture even more of the directory market.

In *Lehrman v. Gulf Oil Corp.*[20] this Court discussed the difficulty of determining whether a business's practices are anticompetitive.

> Few business practices are anticompetitive on their face.... The circumstances surrounding the use of a particular business practice give strong clues as to what those who employ the practice hope to accomplish by it, and what those individuals hope to accomplish may shed light on whether the practice does in fact have the hoped for ... anticompetitive effect.  In short, when a firm displays an anticompetitive animus in the operation of an otherwise ambiguous business practice, what the firm seeks to accomplish provides as sure an indicator of the actual effect of the practice on competition as can be found in the shifting sands of antitrust litigation.

There is some evidence, from studies undertaken by SWB and comments made by Kaufman, that the price increase was intended to restrict the competition.  Appellants argue correctly that this is not a substitute for exclusionary conduct or injury to competition. Nevertheless, it is one more "indicator" of SWB's exclusionary conduct the jury can take into account.

Second, there is evidence that other Companies' DLI prices were only one-third of the price Telephone was charging, and that the terms at which SWB offered the listings were restrictive.  For small independents, like Canyon, SWB's required purchase of the entire directory even if the publisher only wanted small portions

---

[20]464 F.2d 26, 38 n. 9 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972).

of the listings, substantially increased the fixed costs of operation. Independents were required to purchase both the residential and business updates; independents also had to contract to take updates for a period of two years; and if the publisher stopped taking updates within the two years, the publisher could not obtain listings again for another two years.[21]

Third, the evidence supports a finding that Appellants' conduct had an anti-competitive effect on the market. Both the number of publishers' licensing listings and the number of competitive directories sharply declined. The price increase threatened to put Canyon out of business, forced it to increase prices to advertisers—adversely affecting the consumer, and reduced its number of customers. The change contributed to Great Western's decline in profit margin, forced its withdrawal from Richardson, forced it to abandon its plans to enter Little Rock, and halted its historical pattern of entering two to three markets per year. Canyon's and Great Western's continued survival does not preclude them of a remedy.

The crux of Appellants' argument is the contention that Appellees failed to show an antitrust injury. Appellants contend that Great Western not only profited after the DLI price increase, but its profits increased over the previous year. Appellees

---

[21]After the district court questioned the two year requirement at a preliminary injunction hearing, SWB reduced the two year obligation to two months. For the two month period independents had to purchase both business and residential listings, thereafter, they could purchase updates for business only or both.

maintain that the DLI price increased the costs of listings to Great Western as percentage of its sales from 1.87% to 4.56%, exceeding Great Western's 2% profit margin. In other words, Great Western could not maintain its previous increasing rate of expansion and retain its 2% marginal profit. The issue becomes whether this is an injury. Appellees' profits increased in 1989, just not as much as they would have; and for a low profit margin competitor, the price increase halted Great Western's expansion.

*Pierce v. Ramsey Winch Co.*[22] is helpful in shedding light upon this issue. In *Pierce* the plaintiff was a distributor of, among other things, Ramsey cranes. Because Pierce bought the cranes at a substantial discount, due to large purchases made in cash, Pierce was able to sell them individually at a lower price than the manufacturer Ramsey. Therefore, Ramsey refused to supply them to Pierce. Pierce proceeded to buy them from another manufacturer and also focused on other products. After the supply termination, Pierce was able to operate at a profit level even higher than when selling Ramsey cranes. This Court held that despite the increase in profit, Pierce could still establish an antitrust injury by showing it would have earned an even higher profit selling Ramsey cranes but for the actions of Ramsey. Appellees argue analogously that they suffered a similar injury; but for SWB's DLI price increase, Great Western and Canyon would have earned an even higher profit.

The issue before this Court is whether Great Western and

---

[22]753 F.2d 416, 436 (5th Cir.1985).

Canyon suffered an antitrust injury despite an increase in profit. We find that they did. There is sufficient evidence of exclusionary conduct and intent to exclude. This evidence coupled with the fact that Appellees, low profit margin competitors, could have profited more than they did leads this Court to conclude that these actions were sufficient to establish an antitrust injury under *Pierce.*

## Opportunity Lost

Appellants contend the district court erred in denying its motion for directed verdict against Great Western for two reasons. First, Great Western's fear of future price increases is too speculative to support a damage award for abandoning the Richardson market and failing to enter the Little Rock market. Second, Great Western has no standing to sue for its failure to enter Little Rock. We will discuss each in turn.

There is no evidence, Appellants argue, that Great Western could not compete in Little Rock and Richardson at the existing DLI prices. In fact, the district court acknowledged that it was the fear of future price increases, not present DLI prices, that forced Great Western to abandon Richardson and Little Rock. Great Western's claims are not ripe. Appellants contend if Telephone raised DLI prices to exclusionary levels in the future, then Great Western would be entitled to relief.

The court instructed the jury not to award damages unless they were in fact attributable to the alleged wrongful conduct. The jury could find and the court did find that the enhanced investment

15

risk was a material cause of Great Western's abandonment of Richardson and failure to enter Little Rock. Additionally, this Court stated that in cases where the defendant's acts are motivated by intent to injure the plaintiff, the inferential leap to the finding of fact of damage is not great.[23] The district court found "the harm to Great Western and to fair competition was caused by what Defendants did *and* by what Great Western knew they wanted to do, would do, and could continue doing without legal redress being sought." The evidence reveals that SWB had tripled its DLI prices twice within four years and implemented conditions designed to deter new entry. An expert witness testified that investment decisions necessarily take into account risk. The value of a Little Rock entry before the DLI increase was reasonably certain, but not guaranteed. By increasing the risk to new entrants, SWB raised barriers to entry. Great Western not only had to consider present elevated DLI prices but also the risk of future increases over the three year period it takes to enter the market.

Appellant cites several old non-Fifth Circuit cases for the proposition that a plaintiff cannot obtain damages that are to be suffered in the future.[24] These cases are distinguishable. The

---

[23]*Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1565 (5th Cir.1984) (en banc).

[24]*Flintkote v. Lysfjord,* 246 F.2d 368, 395 (9th Cir.), *cert. denied,* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.,* 101 F.2d 79, 81 (2d Cir.1939); *Bailey's Bakery, Ltd. v. Continental Baking Co.,* 235 F.Supp. 705, 716-17 (D.Haw.1964), aff'd, 401 F.2d 182 *cert. denied,* 393 U.S. 1086, 89 S.Ct. 874, 21 L.Ed.2d 779 (1969).

evidence reveals that SWB's conduct elevated the risk of entry into the respective markets *now,* not in the future, to such a degree that a jury could find the risk of entry prevented Great Western from entering the markets.  As the district court stated it was what SWB did and what it could and would continue to do that caused injury.

Appellants' second argument is based on standing.  Appellants contend Great Western has no standing to sue for abandoning its plans to enter the Little Rock market unless it can establish a business or property interest protected by Section 4.[25]  To establish this interest, Great Western must show that it intended and was prepared to enter the market. *Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 313-314 (5th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986). Ample evidence exists in the record of Great Western's intent to enter the Little Rock market.  Appellee had begun investigations into the market, and had set a 1989 date for publication of a Little Rock directory.  However, there is not substantial evidence that Great Western was prepared to enter the Little Rock market.

In assessing a company's preparedness to expand, courts have

---

[25]Great Western alleges that SWB never raised the issue of preparedness in any of its motions for directed verdict, thus permitting this Court to review for plain error only. Preparedness, though, is only an element of standing under the antitrust claims.  SWB expressly challenged the appellee's standing under antitrust in its motions for directed verdict. SWB also stated in its discussion of Great Western's tortious interference claim that Great Western was unprepared to enter the Little Rock Market.  Regardless of the standard of review, Great Western put on no evidence of key aspects of standing as will be discussed.

looked to several factors:  the ability of the plaintiff to finance the business and purchase the necessary facilities and equipment, consummation of contracts by the plaintiff, affirmative action by the plaintiff to enter the business, and background and experience in the prospective business.  *Id.*[26]

This Circuit has typically found lack of standing where a plaintiff lacked evidence on all the preparedness factors.  *Id.* at 315-316 (plaintiff showed no ability to obtain financing);  *Hayes,* 597 F.2d at 974-975 (plaintiff failed to prove ability to finance or contracts made);  *Martin,* 365 F.2d at 634 (plaintiff failed to prove any of the four factors).[27]  While we do not hold that every plaintiff in every case must show all four of the factors to merit standing, we find Great Western's showing to be insubstantial.

While Great Western has experience, there is no evidence of affirmative steps taken, contracts made or financing arranged in preparation to enter the Little Rock market.  The sum total of Great Western's preparation was review of pricing information, two

---

[26]*See also Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir.1979), *cert. denied* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980);  *Martin v. Phillips Petroleum Corp.,* 365 F.2d 629, 633-34 (5th Cir.), *cert. denied* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966);  *Gas Utilities Co. v. Southern Natural Gas Co.,* 996 F.2d 282, 283 (11th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994);  *Curtis v. Campbell-Taggart,* 687 F.2d 336, 338 (10th Cir.), *cert. denied,* 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982).

[27]*Accord Gas Utility Co.,* 996 F.2d at 283 (lack of preparedness to enter new market when no contracts consummated and no financing);  *Curtis,* 687 F.2d at 338 (experience in proposed business operation, unaccompanied by contracts and financing, not enough to establish "business or property" interest).

visits to Little Rock by a corporate officer and setting of a publication date.  Great Western has only demonstrated that it intended to enter the market, not that it was prepared to do business there.

Great Western urges us to find its situation analogous to that of the plaintiff in *Heatransfer Corp. v. Volkswagenwerk A.G.* where we found standing in absence of all four of the factors of preparedness for a plaintiff who intended to expand production, not move into a new market.  553 F.2d 964, 988 n. 20 (5th Cir.1977).[28] The plaintiff in *Heatransfer* had standing in absence of all four factors of preparedness because little preparation was needed.  No significant modification of plaintiff's production facilities was necessary for its expansion.  Nor did plaintiff need to obtain new contract rights or additional sources of financing.  *Id.*

In contrast, for a plaintiff moving into a new market, such as Great Western, the showing of preparedness is fundamental.  We stated that,

> "even though an antitrust plaintiff operates a going concern, he must demonstrate his preparedness and intent to expand that business into a new market if he claims that the expansion of that business into a new market has been foreclosed to him by the monopolistic activities of the defendant." *Id.*

Great Western was not in the position of the plaintiff in Heatransfer.  There were significant barriers to entry to the Little Rock market.  Costs to enter the market were estimated at $1.6 million.  Additionally, Great Western would have had to

---

[28]*See also Cable Holdings v. Home Video,* 825 F.2d 1559, 1562 n. 3 (11th Cir.1987) (citing *Heatransfer* with approval).

establish a new customer base and new contracts. Under these facts, Great Western cannot claim that little or no preparation was required.

Great Western argues that "its plans to enter Little Rock were kept secret" to prevent entrenchment in the market by SWB. However, this Court's eyes are open only to what is in the record. We will not attempt to divine Great Western's machinations but will look to what the company actually did in preparation. Preparation is an element for standing under Section 4 and Great Western did little. Because Great Western was not prepared to enter the Little Rock market, it had no standing to protect an alleged interest in that market. We reverse and remand to the District Court with instructions to dismiss the Little Rock claim.

## Injunction

We review the propriety of a district court's decision to issue a permanent injunction for an abuse of discretion.[29] The factual underpinnings are reviewed for clear error, while the application of legal principles is reviewed de novo.[30] For the

---

[29]*Securities & Exchange Commission v. MacElvain,* 417 F.2d 1134, 1137 (5th Cir.1969) (finding that the district court did not abuse its discretion in entering a permanent injunction), *cert. denied,* 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970).

[30]The district court apparently adopted Appellee's proposed findings in support of the injunction. Such findings merit heightened scrutiny. *Falcon Constr. Co. v. Economy Forms Corp.,* 805 F.2d 1229, 1232 (5th Cir.1986) ("A district court that adopts one party's suggested findings essentially verbatim leaves doubt whether it has discharged its duty to review the evidence for itself and reached its decision on the basis of its own evaluation for the evidence rather than that of an advocate.").

reasons discussed below, we affirm the district court's decision to issue the permanent injunction.

Appellants contend that the district court erred in granting Appellees' injunctive relief because (a) Appellee failed to show the requisite threatened loss or damage, (b) the evidence was insufficient to support Appellees' claim that the updates were essential and the update prices prohibited new entry, and (3) there is no basis for the 13.5 cent amount. Section 16 of the Clayton Act empowers federal courts to grant an injunction "against threatened loss or damage by a violation of the antitrust laws." Appellants' argument is merely more of the same—there is no evidence of a threatened loss. The evidence is sufficient to support a finding that the updates were properly included in the instructions. Testimony from Richard O'Neal, Great Western's founder,[31] corroborated by SWB business plans[32] explained the need to maintain current information through updates. In determining the 13.5 cent price the district court considered the average price per listing charged by other regional Bell operating companies, the effect it would have on basic telephone ratepayers, and the costs of providing the data to independents. Appellant complains that by imposing such a low price, the district court is in effect forcing telephone customers to subsidize operations of the independent

---

[31]Richard O'Neal stated the updates are essential for the independents to call on new businesses and to distribute new directories.

[32]Former Yellow Pages president explained that directory publishers need updated information to develop sales leads and to deliver directories to newly connected users.

directories. The cost of compiling and maintaining the DLI falls squarely upon the ratepayers, when it should be shared more by independents who pay merely pennies more than the cost of copying the data. However, any regulated business can make the same argument and courts nevertheless have uniformly applied antitrust laws to them.[33] Additionally, the district court could find that the 13.5 cent price provided an adequate margin over costs.

On cross-appeal, Great Western and Canyon argue that the injunction should apply across the five state market and not merely where the plaintiffs are located. Broader relief embraces the public interest served by private antitrust lawsuits,[34] while narrow relief places the plaintiffs in a preferred status over its competitors.[35] Furthermore, Appellees contend that if Great Western could not expand, neither could any other independent.

The district court narrowed its injunction because it found that the evidence in this case did not justify injunctive relief in markets other than where the plaintiffs compete. No evidence of direct harm in these markets was provided. Also, the district court recognized that it can grant injunctive relief to non-parties but only if necessary to give the named plaintiffs the continuing

---

[33]*See e.g., OtterTail Power Co. v. United States*, 410 U.S. 366, 372-75, 93 S.Ct. 1022, 1027-28, 35 L.Ed.2d 359 (1973); *Alameda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 353-54 (5th Cir.1980).

[34]*See Wilk v. American Medical Association,* 671 F.Supp. 1465 (N.D.Ill.1987), *aff'd,* 895 F.2d 352 (7th Cir.1990).

[35]*See Loew's Inc. v. Milwaukee Towne Corp.,* 201 F.2d 19, 22-23 (7th Cir.1952), *cert. denied,* 345 U.S. 951, 73 S.Ct. 865, 97 L.Ed. 1374 (1953).

relief to which they are entitled.[36]  We find no error requiring reversal.

We AFFIRM the court below in every respect with the exception that we REVERSE the claim of Great Western with regard to its entering the Little Rock market.  The court below will make the necessary changes in its judgment because of the dismissal by us of the Little Rock claim of Great Western.

---

[36]*See Professional Ass'n of College Educators v. El Paso County Community College Dist.,* 730 F.2d 258, 274 (5th Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984).