United States Court of Appeals,

Fifth Circuit.

No. 95-10893.

TEXAS TANKS, INC., Plaintiff-Appellant,

v.

OWENS-CORNING FIBERGLAS CORP., Defendant-Appellee.

Nov. 14, 1996.

Appeals from the United States District Court for the Northern District of Texas.

Before HIGGINBOTHAM, WIENER and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant, Texas Tanks, Inc. ("TTI") appeals the district court's judgment for Appellee, Owens-Corning Fiberglas Corp. ("Owens-Corning") notwithstanding the verdict and seeks reinstatement of the jury's compensatory damage award of $2,000,000 and exemplary damage award of $3,000,000. Finding that the evidence was legally sufficient to support the jury's verdict, we reverse.

I. PROCEDURAL BACKGROUND

TTI brought this action against Owens-Corning in September of 1994, claiming theft of trade secrets, breach of confidentiality agreements, fraud, and negligent misrepresentation. TTI filed the original action in Texas state district court. Owens-Corning later removed the case to federal district court on the basis of complete diversity.

State law governs this diversity dispute. The parties tried and argued this case on the assumption that Texas law applies.

1

Since there are substantial Texas contacts, this Court will also apply the law of Texas. *House of Koscot Development Corp. v. American Line Cosmetics, Inc.,* 468 F.2d 64, 66 (5th Cir.1972).

From September 11 to September 15, 1995, TTI's claims were tried to a jury. On September 18, 1995, the jury returned a verdict in favor of TTI, awarding $2,000,000.00 in compensatory damages and $3,000,000.00 in exemplary damages. TTI moved for entry of judgment on the jury's verdict, and Owens-Corning moved for judgment as a matter of law notwithstanding the verdict.

The district court granted Owens-Corning's motion for JNOV. Specifically, the district judge found that there was no evidence that Owens-Corning had commercially "used" TTI's trade secrets, and, therefore, the evidence would not support the jury's verdict on theft of trade secrets or breach of confidentiality agreements. In addition, the district judge found that the evidence would not support the jury's verdicts on fraud or negligent representation, or the award of compensatory or exemplary damages. The district court entered judgment in favor of Owens-Corning, and TTI timely appealed.

II. FACTUAL BACKGROUND

TTI is a family owned company that designs and manufactures above-ground petroleum storage tanks (referred to as "AST"). Owens-Corning is a large manufacturer of fiberglass products. This case concerns business dealings between TTI and Owens-Corning from January through April 1994.

In the Spring of 1993, Owens-Corning decided to sell its tank

division, which produced under-ground petroleum storage tanks made from fiberglass. In 1992 and 1993, tank division sales decreased by approximately $40 million annually. Owens-Corning believed it could recapture lost market share and thereby make the tank division more attractive to potential buyers by introducing its own AST. It decided to pursue the licensing of existing technology rather than pursuing its own research and development to allow a quicker market entry. Owens-Corning contacted TTI for the purpose of licensing AST technology for a fiberglass lined tank and negotiations ensued. At TTI's request, each member of Owens-Corning's negotiating team executed a written confidentiality agreement. TTI thereafter disclosed the details of its AST technology, including providing Owens-Corning a prototype tank.

In February or March 1994, during the ongoing negotiations, Owens-Corning began a parallel independent AST development project. On April 1, 1994, Owens-Corning made a formal offer to license TTI's technology, but offered a 1% royalty rather than the 8-12% royalty that had been discussed and excluded the $2,000,000 upfront payment that TTI had insisted on throughout the negotiations. TTI did not accept this offer.

Owens-Corning eventually sold its tank division to Fluid Containment, Inc. Owens-Corning never marketed or sold an AST. At the time of trial, Fluid Containment, Inc. had not developed, marketed or sold the type of AST at issue in this case.

III. SUFFICIENCY OF THE EVIDENCE

a. Standard of review.

3

The primary issue presented for our review is whether the district court erred in concluding that the evidence was not legally sufficient to support the jury's verdict. This Court reviews a judgment as a matter of law *de novo,* applying the same standard as the district court. *Great Western Directories, Inc. v. Southwestern Bell Telephone Co.,* 63 F.3d 1378, 1384 (5th Cir.1995). The district court, in entertaining a motion for directed verdict or JNOV, must view the evidence in the light most favorable to the party against whom the motion is made. *Id.* On appeal, this Court must consider the evidence in the same way, giving the non-moving party the advantage of all reasonable inferences the evidence justifies. A judgment notwithstanding the verdict should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that a reasonable juror could not arrive at a contrary verdict. *Id.*

Since this case comes to us on a judgment notwithstanding the verdict, we will review the evidence in the light most favorable to the non-movant, TTI, and thus in the light most favorable to the jury's verdicts. There was conflicting evidence on many points, but the evidence was sufficient for the jury to draw the following conclusions.

b. The evidence.

TTI's owner, William A. Hall and his sons developed the first AST to receive an Underwriter's Laboratories ("UL") approval. The Halls were instrumental in securing changes in the relevant fire codes and UL testing procedures that allowed widespread

4

introduction of ASTs into the storage tank market in 1993.

Owens-Corning is an international manufacturer and seller of fiberglass related products. Owens-Corning's tank division was the largest manufacturer and seller of underground petroleum storage tanks in the world. The tank division's significant net losses in 1992-93 resulted, in part, from the introduction of ASTs into the market.

During the course of the licensing negotiations, TTI explained design specifications and production methods and provided drawings of critical design elements. TTI indicated early on in the discussions that it would not be willing to license its technology, sell production equipment and release its sales force, (all terms that were discussed) without an up-front payment of $2,000,000.00. This was the amount the Halls estimated it would take to reimburse the expenses and debt incurred in the research and development of the AST. At the time Owens-Corning contacted TTI, TTI was exploring the availability of investment capital with financial advisors and potential investors. TTI broke off those discussions when Owens-Corning indicated that it was committed to pursuing a business relationship.

During negotiations, Owens-Corning requested information on the patents TTI had applied for and obtained the rights to. The Halls testified that the only concern Owens-Corning expressed regarding patents was that it needed to avoid infringing on anyone else's patents when it marketed its own AST. Owens-Corning also expressed concern regarding UL approval of an AST with a fiberglass

5

inner tank. TTI assured Owens-Corning that it could obtain that approval. TTI had already passed UL tests with a fiberglass clad, steel inner tank, and did in fact receive UL approval on an AST with a fiberglass inner tank after the negotiations had come to a stand-still.

Because Owens-Corning was planning to sell its tank division, Owens-Corning chief negotiator Mike Messmer had been told he did not have the authority to enter into an agreement that required an up-front payment. Therefore, he knew when he began negotiations with the Halls that their insistence on a $2 million dollar up-front payment would be a problem. Nevertheless, Messmer never told the Halls that he did not have that authority. Instead, Messmer indicated that he could put the up-front payment in the contract as guaranteed profit on initial purchases of inventory.

During the negotiations, the parties discussed a royalty on ASTs sold by Owens-Corning in the amount of 12, 10, and 8 percent, decreasing over time.

During the negotiations, Owens-Corning began to develop its own AST. Although Owens-Corning contends that Dave Bartlow, an Owens-Corning engineer, developed an AST design relying entirely on intuition, general engineering knowledge, and the advice of expert suppliers, there is ample evidence that Bartlow participated in detailed discussions with Owens-Corning's negotiating team regarding TTI tank design and production techniques. In the middle of March, these Owens-Corning representatives created invention records, a preliminary step in the patent application process, for

6

their own AST design.  Bill Hall, Sr. testified that the drawings attached to Owens-Corning's invention records were virtual copies of the drawings TTI had provided during negotiations.  Owens-Corning secretly produced its own AST prototype for testing and actively pursued potential buyers for its tank division, using the prospect of an AST that was in development.

On April 1, 1994, Owens-Corning sent the Halls an offer that included no up-front payment and a royalty of 1%.  It is undisputed that this proposal did not reflect the terms negotiated by the parties.  Owens-Corning representatives admitted that the Halls had consistently demanded the up-front payment and that they knew there was no chance TTI would accept the proposal.  Owens-Corning claims that the reason for the drastic change in the proposal was the determination that the Halls' patents were worthless because they were so narrow that they would not be effective as offensive tools to keep other companies from producing competing ASTs.  The Halls testified that this had never been an expressed concern.

c. Analysis.

1. Theft of trade secrets.

The district court instructed the jury that

> to establish a trade secret violation, plaintiffs have the burden of proving by a preponderance of the evidence that
>
> *First,* trade secrets existed;
>
> *Second,* the defendant acquired those secrets as a result of a confidential relationship;
>
> *Third,* that the defendant used the secret information (without authorization of the plaintiff).
>
> Only wrongful use of secret information disclosed in

7

confidence gives rise to liability. To find defendant liable for misappropriation of trade secrets, you must find by the preponderance of the evidence that plaintiff had specific, identifiable trade secrets which were acquired by the defendant as a result of a confidential relationship and that defendant used these secrets in developing or making its product.

This instruction is consistent with Texas law on theft of trade secrets, *see Sikes v. McGraw-Edison Co.,* 665 F.2d 731, 733 (5th Cir.1982); *Hurst v. Hughes Tool Co.,* 634 F.2d 895, 896 (5th Cir.1981), and the parties do not argue that it was an inaccurate instruction.

In its motion for JNOV Owens-Corning argued that the evidence fails to support the jury's conclusion that Owens-Corning used TTI's trade secrets. Likewise, the district court's order granting JNOV focused on the "use" requirement, holding:

There is no evidence that the Defendant used the Plaintiff's technology. The Defendant has never marketed or sold an aboveground storage tank. There is furthermore no evidence that the Defendant provided to Fluid Containment, Inc., the purchaser of Defendant's tank division, any of the Plaintiff's proprietary information. The evidence shows that Fluid Containment, Inc. has not marketed or sold an aboveground storage tank containing a fiberglass inner tank. No evidence was offered which showed that Fluid Containment, Inc. had intentions or plans to develop, market, or sell the type of aboveground storage tank at issue in this case. Thus, no evidence supports the jury's findings on breach of contract or theft of trade secrets.

Therefore, our review of the jury's trade secrets verdict will be limited to determining whether the evidence supports the finding that Owens-Corning "used" TTI's trade secrets.

TTI presented evidence that the same individuals at Owens-Corning who had access to their proprietary information were leading Owen-Corning's effort to develop its own AST and that the

8

drawings Owens-Corning included in its invention records were virtual copies of TTI's drawings. Also, Owens-Corning "used" the development of the AST to enhance the value and attractiveness of the tank division to potential buyers. Owens-Corning argues that these actions do not, as a matter of law, constitute the commercial use necessary to support a theft of trade secrets verdict. Owens-Corning takes too narrow a view of "use".

Discussing this issue in a similar context, a Texas court of appeals has stated that using trade secrets to complete the design for a competing device, consulting a patent attorney about protecting its design, and seeking financing from investors for the development of its product constituted a commercial use even though the defendant had not commenced production and sales of its product. *Garth v. Staktek Corp.,* 876 S.W.2d 545 (Tex.App.—Austin 1994). "Any misappropriation of trade secrets, followed by an exercise of control and domination, is considered a commercial use." *Id.* at 548. Viewing the evidence in the light most favorable to the verdict, there was sufficient evidence in this case to allow the jury to conclude that Owens-Corning made use of TTI's trade secrets.

Because we find sufficient evidence to support the jury's verdict on theft of trade secrets, and the damages awarded may all be attributed to a single claim, we need not address plaintiff's other causes of action.[1]

---

[1]The question of damages was submitted to the jury, without objection, as follows:

2. Compensatory damages.

The district court held that the jury's award of compensatory damages is not supported by sufficient evidence because TTI's evidence of damages is too speculative.  There was uncontroverted evidence that TTI's demand for an up-front payment of $2 million was reasonably based on its cost of research and development.

In *University Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518 (5th Cir.1974), this Court developed a flexible standard for measuring damages in a theft of trade secret case.[2]  While noting that a plaintiff's costs of development would frequently be inadequate to sufficiently compensate the plaintiff, we held that this was one possible, and allowable, component in the calculation of damages.  *Id.* at 538.  Using this measure of damages, rather that some computation of lost profits, we find that the evidence was more than sufficient to support the jury's award of $2 million in compensatory damages.

3. Exemplary damages.

The jury was allowed to award exemplary damages if it found

_____

> If you have answered "Yes" to Question 1, 2, 3, or 4, [plaintiff's individual claims] then answer the following question....
>
> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Texas Tanks, Inc. for its damages, if any, that were proximately caused by the conduct, if any, of Owens-Corning Fiberglas Corporation?

[2]Although *University Computing* was a decision under the Georgia law of trade secrets, Georgia, like Texas, bases its law of trade secrets on the Restatement of Torts § 757 (1939).  Further, the Austin, Texas Court of Appeals in *Garth* relies on *University Computing.  Garth,* 876 S.W.2d at 549.

10

that Owens-Corning acted with malice or conscious indifference towards the rights of TTI. "Malicious" was defined for the jury as "done willfully and purposely, to the injury of another." TTI relies on evidence that Owens-Corning began development of their own AST design one week after they received delivery of TTI's prototype; Owens-Corning had its own secret prototype ready for testing within six weeks after they began work on the project, rather than the two years they originally estimated such a project would require; and that Owens-Corning included copies of TTI trade secrets in its AST invention record. Owens-Corning's conflicting evidence notwithstanding, the jury's award of exemplary damages was supported by sufficient evidence.

IV. ATTORNEYS FEES

TTI appeals the district court's failure to award its attorney's fees. Since no cause of action alleged by TTI would allow the award of exemplary damages and attorneys fees, this Court may affirm the award that would allow the largest recovery—in this case, exemplary damages. *See Star Houston, Inc. v. Shevack,* 886 S.W.2d 414, 422 (Tex.App.—Houston (1st) 1994). Therefore, we find TTI's argument for award of attorney's fees without merit.

V. CONCLUSION

For the foregoing reasons, we reverse the district court's JNOV and remand for entry of judgment in favor of TTI pursuant to the jury's verdict.

REVERSED AND REMANDED.

11