**FLORIDA SEED COMPANY, INC., and Frit Industries, Inc., Plaintiffs,**

v.

**MONSANTO COMPANY, Defendant.**

Civ. A. No. 94–D–514–N.

United States District Court,
M.D. Alabama,
Northern Division.

Nov. 9, 1995.

Charles M. Crook, John F. Mandt, Birmingham, AL, for plaintiffs.

Warren B. Lightfoot, John M. Johnson, John P. Dulin, Birmingham, AL, for defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is defendant Monsanto Company's motion filed June 23, 1994, to dismiss the federal antitrust claims on the ground that the plaintiffs lack standing. Plaintiffs Florida Seed Co., Inc., and Frit Industries, Inc., responded in opposition on August 4, 1994. After careful consideration of the arguments of counsel, the applicable case law and the record as a whole, the court finds that the defendant's motion is due to be granted.

## JURISDICTION AND VENUE

As to the federal antitrust claims, the plaintiffs predicate subject-matter jurisdiction under 28 U.S.C. § 1331 (federal-question jurisdiction). As to the state-law claims, the plaintiffs invoke the court's diversity-of-citizenship jurisdiction, 28 U.S.C. § 1332, and principles of supplemental jurisdiction, 28 U.S.C. § 1367. Personal jurisdiction and venue are not contested.

## PARTIES

(1) Plaintiff Florida Seed Company, Inc. ("Florida Seed"), is engaged in the business of wholesale distribution and marketing of lawn and garden products. Florida Seed is incorporated in Florida and also maintains its principal place of business in Florida.

(2) Plaintiff Frit Industries, Inc. ("Frit"), is the sole stockholder of Florida Seed. Frit is incorporated in Alabama with its principal place of business in Alabama. In addition to its ownership of Florida Seed, Frit also is involved in a variety of businesses, including the development and production of lawn and garden products.

(3) Defendant Monsanto Company ("Monsanto") is engaged in the manufacture and sale of a diversified line of chemicals, including lawn and garden products. Monsanto is incorporated in Delaware with its principal place of business in Missouri.

## FINDINGS OF FACT

In viewing the allegations of the complaint as true, the court finds the following facts controlling for purposes of ruling on Monsanto's motion:

On May 2, 1994, the plaintiffs commenced this action in the United States District Court for the Middle District of Alabama and have asserted that certain acts of Monsanto violate the federal antitrust statutes and state laws. This controversy primarily stems from Monsanto's alleged illegal acquisition of its competitor in the residential non-selective herbicide market, Ortho Consumer Products Division of Chevron Corporation ("Ortho"), and the subsequent termination of Florida Seed as an Ortho distributor.

Count I of the complaint asserts that Monsanto has attempted to create, and has in fact created, a monopoly in the residential non-selective herbicide market in violation of § 2 of the Sherman Act (15 U.S.C. § 2) and state antitrust laws. The plaintiffs assert that Count I also encompasses a monopoly leveraging claim under § 2 of the Sherman Act. Count II sets forth a cause of action under § 7 of the Clayton Act (15 U.S.C. § 18) for

Monsanto's alleged unlawful acquisition of Ortho.[1]

Monsanto manufactures and sells an agricultural product named Roundup, a residential non-selective herbicide designed to kill all types of vegetation, such as brush, weeds and grasses. Monsanto holds a United States patent to Roundup's key ingredient called glyphosate. Although Monsanto's United States patent will not expire until the year 2000, its European patent expired in 1991. According to the plaintiffs, the expiration of Monsanto's patents and threatening competition caused Monsanto to take steps to maintain its market dominance, which included the acquisition of its competitor, Ortho. Those steps, assert the plaintiffs, are aimed at the destruction of Ortho and directed toward Florida Seed.

Until the Spring of 1993, Monsanto sold glyphosate to Ortho, which used the patented ingredient in a similar product sold under the brand name of Kleenup. According to the plaintiffs, Monsanto controls 63% of the residential non-selective herbicide market through its ownership of Roundup, and Kleenup accounts for another 22% of the market.

From the mid–1980s to 1992, Florida Seed had a nonexclusive distributorship agreement with Monsanto to distribute Roundup and other Monsanto products to retail stores chain accounts, such as Wal–Mart and The Home Depot. Under the agreement, which was renewed annually through course of dealing, Florida Seed's marketing and sales territory included Alabama, Florida and Georgia.

Florida Seed simultaneously held a nonexclusive distributorship agreement with Ortho to market and sale its products at wholesale (including Kleenup) in Alabama, Florida, Georgia, Louisiana and Mississippi. This agreement also was renewed annually through course of dealing. According to the plaintiffs, Florida Seed was one of Ortho's leading and most effective distributors in the nation.[2] During the period when Florida Seed acted as a distributor of Monsanto and Ortho products, both companies restricted Florida Seed from manufacturing competing lawn and garden products.

By letter dated July 1, 1992, Monsanto notified Florida Seed that it would not renew Florida Seed's distributorship agreement, which was scheduled to expire on September 30 of the same year. The letter stated that Monsanto had made a " 'strategic decision' " to " 'work with fewer authorized Monsanto distributors.' " Pls.' Compl. at ¶ 24. Following the termination of its distributorship agreement with Monsanto, Florida Seed continued to market and sell Kleenup for Ortho.

By letter dated May 20, 1993, Monsanto notified Florida Seed that Monsanto had acquired Ortho and that it would honor all current distribution agreements. Subsequently, in a letter dated July 23, 1993, Monsanto again wrote Florida Seed and stated that when Florida Seed's current agreement to distribute Kleenup and other former Ortho products expired on September 30, 1993, Monsanto would not renew the distributorship agreement. The stated reason for nonrenewal was again a purported business decision by Monsanto to use fewer distributors.

Later, Monsanto sent Frit, Florida Seed's parent corporation, a "Guaranty" demanding that Frit pay Ortho all indebtedness owed by Florida Seed and return any products not yet sold. Monsanto further stated that the "Guaranty" had been assigned to it in its acquisition of Ortho.

Monsanto's proposed acquisition of Ortho independently caused the Federal Trade Commission ("FTC") to file an administrative complaint against Monsanto. According to the plaintiffs, the FTC asserted, among other things, that the acquisition of Kleenup would

---

1. The plaintiffs also seek redress under state laws for breach of contract (Count III), misrepresentation (Count IV), and unfair competition/wrongful termination in violation of Florida statutes "or other applicable state law" (Count V). The validity of the state law claims is not before the court.

2. In support of this factual assertion, the plaintiffs aver that in 1992, Ortho began reducing the number of outside distributors and initiating direct sales to large retail chains. According to the plaintiffs, while Ortho terminated approximately thirty distributors under its "Distributor Rationalization Program," it retained Florida Seed. See Pls.' Compl. at ¶ 26.

grant Monsanto a monopoly in the residential non-selective herbicide market, would reduce competition in the United States for the production and sale of this type of herbicide and would create barriers to market entry.

Subsequently, on September 1, 1993, Monsanto entered into a consent decree with the FTC to resolve allegations that the acquisition violated federal antitrust laws. The consent decree allowed Monsanto to acquire Ortho but placed certain divesture restrictions on the purchase of Kleenup. In part, Monsanto agreed to sell the chemical formulation and the trademark for Kleenup by September 1994 and to maintain the marketability of the Kleenup assets until the divesture was complete.[3] The consent decree further required that for a period of ten years, Monsanto would not acquire any interest in the residential non-selective herbicide market.

The plaintiffs further allege that following Monsanto's termination of Florida Seed's distributorship agreement with Ortho, Florida Seed was forced to withdraw from National Prime Source. As stated by the plaintiffs, National Prime Source is a joint venture among fifteen wholesale distributors of lawn and garden products that Florida Seed helped organize in 1992. According to the plaintiffs, National Prime Source "enable[d] its members to compete for multi-regional and national mass merchandising accounts which generally preferred to do business with distributors offering centralized bidding and administrative functions." *Id.* at ¶ 22. The plaintiffs also aver that Florida Seed has sustained substantial damages from its inability to sell to retail chain store accounts.

The plaintiffs seek treble damages under the federal antitrust laws, compensatory damages and attorneys fees. The plaintiffs also request a declaratory judgment that any amount due and payable from Florida Seed to Monsanto under the "Guaranty" are offset by the damages owed to Florida Seed by Monsanto and that Frit is not liable under the "Guaranty" for any debts of Florida Seed to Monsanto.

## DISCUSSION

### I. Antitrust Standing

#### A. Standard of Review

Whether a plaintiff has antitrust standing to bring suit is a question of law, *Municipal Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1498 (11th Cir.1991), and may be raised by a motion to dismiss. *See generally Austin v. Blue Cross & Blue Shield of Alabama*, 903 F.2d 1385 (11th Cir.1990). In ruling on a motion to dismiss for lack of standing, the court must assume that the factual allegations in the complaint are true. *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.*, 48 F.3d 39, 40 (1st Cir.1995); Fed.R.Civ.P. 12(b)(6). Dismissal is warranted only "if it is clear that no relief could be granted" under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). The court further stresses that "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *Quality Foods v. Latin Am. Agribusiness Dev.*, 711 F.2d 989, 995 (11th Cir.1983).

#### B. The Antitrust Laws and General Principles of Antitrust Standing

Monsanto does not challenge the merits of the federal antitrust claims but asserts that the plaintiffs lack standing under § 2 of the Sherman Act and § 7 of the Clayton Act. The plaintiffs have raised several theories that allegedly confer standing, each of which the court will address after setting forth the applicable antitrust statutes and the general principles of antitrust law.

Section Two of the Sherman Act provides sanctions for "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or

---

**3.** When the complaint was filed in this case, the purchasing company of the Kleenup assets had not yet been determined. The court's independent research reveals that the FTC approved the divesture of the Kleenup trade name and other related assets to Platte Chemical Co., a subsidiary of ConAgra, Inc. *See* Federal Trade Commission (News Release), 1995 WL 507355, Sept. 14, 1995.

persons, to monopolize any part of the trade or commerce...." 15 U.S.C. § 2. Section 7 of the Clayton Act provides, in part, as follows:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly.

15 U.S.C. § 18.

Section 4 of the Clayton Act, in turn, provides a damages remedy for violations of all federal antitrust laws, including § 2 of the Sherman Act and § 7 of the Clayton Act. Namely, when a private party claims monetary relief under the antitrust laws, as here, § 4 of the Clayton Act permits recovery by any person "injured in his [or her] business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (brackets supplied).

■ Despite the broad language of § 4, the courts have limited a private party's right to bring an antitrust action through restrictions on standing. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972) (stating that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation"). The Eleventh Circuit traditionally has employed the two-pronged target area test to determine if a plaintiff has antitrust standing.[4] *Municipal Utils. Bd. of Albertville*, 934 F.2d at 1499. The first step is to determine whether the plaintiff has suffered antitrust injury. *Id.* The Supreme Court has defined "antitrust injury" as an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitve acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (citations omitted). While the Supreme Court's definition is somewhat obscure in application, it is clear that a plaintiff "must prove more than injury causally linked to an illegal presence in the market." *Id.*

■ The second prong of the Eleventh Circuit's standing test is to determine whether the plaintiff is an efficient enforcer of the antitrust laws. *Municipal Utils. Bd. of Albertville*, 934 F.2d at 1499. In other words, a plaintiff must "prove that he [or she] is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry" and "be the target against which anticompetitive activity is directed." *National Ind. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co.*, 748 F.2d 602, 608 (11th Cir.1984), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 544, 88 L.Ed.2d 473 (1985) (brackets supplied).

---

**4.** In *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 536–45, 103 S.Ct. 897, 907–912, 74 L.Ed.2d 723 (1983), the Supreme Court of the United States set forth a flexible, case-by-case standard for resolving an antitrust standing issue and emphasized that courts should consider the following factors: (1) a causal connection between an antitrust violation and harm to the plaintiff, (2) an intent by the defendants to cause the harm, (3) the existence of an antitrust injury, (4) the directness of a causal link between the injury and the market restraint, (5) the speculative nature of the damages, and (6) the risk of duplicate recoveries or complex apportionment of damages.

Subsequently, in *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1496 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986), the Eleventh Circuit held that the target area test "does not produce results materially different from the results obtained in" *Associated Gen. Contractors. Id.* at 1520; *See also Mr. Furniture v. Barclays Am./Commercial, Inc.*, 919 F.2d 1517, 1520 n. 1 (11th Cir.1990), *cert. denied*, 502 U.S. 815, 112 S.Ct. 68, 116 L.Ed.2d 43 (1991). Accordingly, the court will proceed under the target area test and also will bear in mind the factors set out by the Supreme Court.

In sum, the primary purpose of the standing requirements is to assure that the injuries alleged are not "merely indirect, secondary, or remote." *Construction Aggregate Transport, Inc. v. Florida Rock Indus., Inc.,* 710 F.2d 752, 764 (11th Cir.1983) (citation omitted). That is, standing "safely limit[s] the class of potential plaintiffs to those persons who will most adequately vindicate the purposes of the antitrust laws." *Id.* at 762–63 (citation omitted); *see also Greater Rockford Energy & Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 394 (7th Cir.1993) ("Given the potential scope of antitrust violations and the availability of treble damages, an overbroad reading of § 4 could result in 'overdeterrence,' imposing ruinous costs on antitrust defendants, severely burdening the judicial system, and possibly chilling economically efficient behavior."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994).

### C. Analysis

To paraphrase, Count I asserts that Monsanto's acquisition of Ortho and subsequent termination of Florida Seed's distributorship agreement was part of a scheme to "preserve or expand" Monsanto's monopoly in the residential non-selective herbicide market by destroying the marketability of its competitor product, Kleenup, all in violation of § 2 of the Sherman Act. Pls.' Compl. at ¶ 34. According to the plaintiffs, Monsanto illegally took advantage of its short-term control of both Roundup and Kleenup and commenced anticompetitive actions to impair Kleenup's marketability by stifling the distribution channels for that product. The termination of Florida Seed's distributorship agreement was a monopolistic act aimed directly at Florida Seed because, according to the plaintiffs, the best way to squelch the distribution channels of Kleenup was to terminate effective distributors, such as Florida Seed.

The plaintiffs also allege that under § 2 of the Sherman Act, Monsanto's conduct constitutes monopoly leveraging, which in-

volves "using a monopoly in one market to gain a competitive advantage in a second, where the purpose is not to monopolize or attempt to monopolize the second market." *Multistate Legal Studies v. Harcourt Brace Publ.,* 63 F.3d 1540, 1551 n. 8 (10th Cir. 1995).[5] The allegations contained in Count II are as follows:

> Monsanto's acquisition of Ortho has had and will have the effect of substantially lessening competition or tending to create a monopoly in the relevant market in violation of Section 7 of the Clayton Act.... But for the illegal acquisition, Florida Seed would not have been terminated as a distributor of Ortho products including Kleenup, and Florida Seed would have retained its ability to sell lawn and garden products to large retail chain accounts and to continue to participate in [National] · Prime Source.

*Id.* at ¶ 36 (brackets supplied).

In determining whether the plaintiffs have antitrust standing, the court must assume that Monsanto has violated § 2 of the Sherman Act and § 7 of the Clayton Act. *See Mr. Furniture,* 919 F.2d at 1520 n. 2. The primary argument raised by Monsanto is that Florida Seed does not have standing to challenge an alleged illegal acquisition at the manufacturing level because Florida Seed is neither a competitor or consumer in the relevant market, which according to Monsanto is limited to the manufacture of residential non-selective herbicides. Generally, but not always, a plaintiff must be either a consumer or competitor in the relevant market, or the injury likely will be too remote from the alleged violation. *See Associated Gen. Contractors,* 459 U.S. at 539, 103 S.Ct. at 909.

Monsanto correctly points out by way of numerous case citations that distributors terminated after illegal mergers of manufacturers usually lack standing to sue under the antitrust laws. For example, Monsanto re-

---

**5.** There is a split among the circuits as to whether monopoly leveraging is illegal and, thus, whether such a claim can be asserted as a cause of action under § 2 of the Sherman Act. *See Multistate Legal Studies,* 63 F.3d at 1551 n. 8; *Advanced Health–Care Serv. v. Radford Com.*

*Hosp.,* 910 F.2d 139, 149 (4th Cir.1990); *Return on Investment Systems v. Translogic Corp.,* 702 F.Supp. 677 (N.D.Ill.1988). The court need not confront this issue, however, because as discussed, *infra,* the plaintiffs lack standing to bring a claim under the federal antitrust laws.

lies on *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir.1977). There, the defendant, Olympia, acquired Hamm's brewing and terminated Hamm's distributors, including the plaintiff, Lenore. Lenore sued Olympia, alleging that the acquisition violated § 7 of Clayton Act because it substantially lessened competition. The district court granted summary judgment in favor of Olympia, and the Ninth Circuit affirmed. The Ninth Circuit looked to *Brunswick, supra*, and held that Lenore did not have standing to sue because it had not suffered antitrust injury:

> Even though Lenore's injury may have "... occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisition unlawful." The terminations were an "incidental matter which the merger may have made possible, but certainly did not cause." All Lenore really alleges is that because Olympia purchased the Hamm's brand, Lenore was replaced in favor of other distributors. This is insufficient to make out a case under § 7 which is concerned with competition, not competitors.

550 F.2d at 500 (internal citations omitted). In sum, the court determined that the acquisition of Hamm violated the antitrust laws, if at all, because competition was reduced in the manufacture of beer, a market in which Lenore was neither a competitor or consumer.

In a similar case relied upon by Monsanto, *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2nd Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995), the Second Circuit analyzed terminated distributors' ability to obtain standing under § 2 of the Sherman Act. The plaintiffs were a group of former soft drink distributors for Seven–Up Brooklyn. They brought antitrust claims against several defendants, including Honickman, the latter of whom sought to acquire Seven–Up Brooklyn. Honickman and Seven–Up Brooklyn were two of the three soft drink bottling companies in New York City. Without including the Seven–Up brands, Honickman controlled more than one-half of the soft drink sales to retailers in New York City.

Honickman provided financing to its various affiliates for the purchase of Seven–Up Brooklyn, a transaction that gave rise to an FTC investigation. When the FTC disallowed the acquisition asserting antitrust violations, the plaintiffs claimed that Honickman and the other defendants conspired to cause Seven–Up Brooklyn to file for bankruptcy. If Seven–up Brooklyn filed for bankruptcy, then according to the plaintiffs, Honickman could reacquire it under the failing company defense and avoid repercussions under the federal antitrust laws. This is in fact what happened.

The Second Circuit held that the plaintiffs' injuries were derivative only and failed to rise to a level of antitrust injury sufficient to confer standing:

> If Seven–Up Brooklyn, before its bankruptcy, had canceled its distribution agreements and hired delivery drivers as employees, the distributors would not have been able to assert an antitrust violation. Lacking such a claim against Seven–Up Brooklyn, the distributors also lack a claim against Honickman [and the other defendants] who, having taken over Seven–Up Brooklyn's business, have not hired the plaintiffs as distributors.
>
> Although the distributors undoubtedly suffered injury as a result of the alleged antitrust violation, the injury suffered by the distributors is derivative of the injury suffered by Seven–Up Brooklyn. Thus, accepting the antitrust allegations as true, it was not the distributors that suffered direct antitrust injury, but Seven–Up Brooklyn. Therefore, the proper party to bring the antitrust action on these facts was Seven–Up Brooklyn, or, after its bankruptcy, the estate's trustee.

*Id.* at 767; *see also Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977) (denying sub-distributor standing to enjoin a merger when its exclusive distributor was replaced after a merger).

■ The court finds that the same result is required in this case. While Florida Seed's injuries undoubtedly resulted from the termination of its distributorship agreement for Kleenup, the court finds that the injury sustained is too remote. If Ortho,

prior to Monsanto's acquisition, had terminated Florida Seed, Florida Seed could not have attacked as illegal Ortho's decision. The same would be true if after divesture of the Kleenup assets, the purchasing company had not retained Florida Seed as a distributor.

In making its finding, the court further assumes that Monsanto's goal was to gain control of the non-selective herbicide market and that Florida Seed was an effective distributor. However, even assuming such, the court finds that the damages claimed by the plaintiffs (loss of competition at the distributor level) are not the type of anticompetitive injury that the antitrust laws were intended to remedy. The court finds that if the merger is illegal, the illegality stems from decreased competition in the manufacture of residential non-selective herbicides.

The court, after carefully examining the law, cannot find any cases, nor have the plaintiffs cited any, that would warrant a contrary finding. In fact, the cases relied on by the plaintiffs are inapposite. For example, the plaintiffs rely on *DeLong v. Washington Mills Electro Min.,* 990 F.2d 1186 (11th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993), for the proposition that a manufacturer's short-term control over intrabrand competition gives a terminated dealer standing. The *DeLong* court, however, held that a distributor had standing where the manufacture terminated the distributorship because the distributor objected to a price-fixing conspiracy directed towards the consumer. Quite a different fact scenario is present here.

The difficulties that a terminated distributor may face in obtaining standing to contest an illegal merger are explained in P. Areeda & H. Hovenkamp, Antitrust Law ¶ 381 (rev. ed. 1995) (internal footnotes omitted) (brackets supplied):

> Many mergers have been challenged by suppliers (including dealers, franchisees, and employees providing the merging firms with distribution and other services) displaced as a result of the merger. Injury-in-fact may be doubtful when equivalent opportunities are available elsewhere. If other opportunities do not exist [as alleged by Florida Seed], displaced suppliers made redundant by a merger suffer actual losses but not antitrust injury, for the rationale for condemning a merger lies in its potential for supracompetitive pricing, not in its potential for cost savings and other efficiencies. A merger that actually brings about supracompetitive prices and diminished output reduces the need for inputs and can therefore injure suppliers. Although such an injury connects more closely with the rationale for finding a violation, it is still not antitrust injury because it is neither the means by which output is restricted nor the direct concern of antitrust rules protecting product market competition.

[redacted] The plaintiffs, on the other hand, argue that as a wholesale distributor to retail consumers, Florida Seed competes with manufacturers, such as Monsanto, which also engage in direct sales to retail consumers. Hence, according to the plaintiffs, the relevant market encompasses the marketing and selling of residential non-selective herbicides, in addition to manufacturing. The court agrees with the plaintiffs that at this stage of the litigation, the factual allegations with respect to the relevant markets must be accepted as true. *See Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982); *see also Construction Aggregate Transport, Inc.,* 710 F.2d at 764 (recognizing that more than one "sector of the market may be the target for a particular anticompetitive act"). Nonetheless, the court is not persuaded by the plaintiffs' argument. In *Honickman,* the Second Circuit rejected this " 'distribution monopoly' " argument:

> The distributors attempt to recharacterize their antitrust claims by arguing that they suffered antitrust injury in the elimination of competition in retail distribution between themselves and Honickman. However, the so-called "distribution monopoly" is derived entirely from Honickman's share of the bottling market. Honickman's "distribution monopoly" thus involves only his product. Moreover, a vertically structured monopoly can take only one monopoly profit. *See Lamoille Valley R.R. v. ICC,* 711 F.2d 295, 318 (D.C.Cir.1983); *see also*

Robert H. Bark, The Antitrust Paradox 229 (2d ed. 1993); 3 Philip Areeda & Donald F. Turner, Antitrust Law 21 725b (1978).

55 F.3d at 767.

■ In the alternative, Florida Seed argues that, at the very least, it is a potential competitor in the manufacturing arena. The court is not persuaded by this argument either. The court recognizes that a plaintiff who was never in a market, here the manufacturing market, sometimes can succeed on a claim that he or she would have entered it had the defendant's antitrust violation not kept him or her out. To state such a claim, the plaintiff must show a financial ability to enter the market, the appropriate background and experience that makes success possible and steps evidencing an intent to enter the market. *See In re Dual Deck Video Cassette Recorder Antitrust Litigation,* 11 F.3d 1460, 1465 (9th Cir.1993); *Great Western Directories, Inc. v. Southwestern Bell Tel. Co.,* 63 F.3d 1378, 1389 (5th Cir. 1995).

■ Admittedly, Florida Seed's inability to manufacture residential non-selective herbicides is directly attributable to the prohibitive contractual clauses contained in its distributorship agreements with Monsanto and Ortho. Florida Seed, however, has not pointed to any authority indicating that such a restriction is illegal in an antitrust sense or that the factors recited in *Dual Deck Video Cassette* need not be proven when such a clause has prohibited market entry. In fact, it appears that Florida Seed would not have complained of its inability to enter the market if its distributorship agreements had not been terminated.

■ Florida Seed continues by arguing that its assertion that it is a potential competitor, in and of itself, is sufficient to confer standing because at this stage all factual assertions must be taken as true. The court, however, need not and should not adopt in totum conclusory allegations. In other words, a motion to dismiss cannot be defeated with "conclusory allegations ... if not supported by facts constituting a legitimate claim for relief. . . ." *Municipal Utili-*

*ties Bd. of Albertville,* 934 F.2d at 1495; *see also Lombard's, Inc. v. Prince Mfg., Inc.,* 753 F.2d 974, 975 (11th Cir.1985). Here, the plaintiffs have not alleged the existence of any of the *Dual Deck Video Cassette* factors, which the court must examine to assess a company's preparedness to enter a market. The complaint is devoid of any facts that Florida Seed had a genuine intent to enter the market and a preparedness to do so. In other words, the court finds that there is no set of facts by which Florida Seed can show that it is a potential competitor.

■ Even if the court were to find that Florida Seed suffered antitrust injury, this finding alone cannot confer standing, because "only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4." *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 516 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). The court finds that other more direct victims exist. If Monsanto is in fact squelching the marketability of its competitor products, the company who acquired the Kleenup assets or another manufacturing company in the same market would be a more appropriate plaintiff. Likewise, consumers of residential non-selective herbicides could maintain an action if Monsanto's action stifled competition allowing Monsanto to engage in monopoly pricing in retail stores. *See generally SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,* 48 F.3d 39 (1st Cir.1995). In other words, a finding that Florida Seed has standing to bring an antitrust lawsuit could potentially open the litigation floodgates to all distributors terminated as a result of the alleged illegal merger. The focus of the litigation would then be on the individual injuries and not the damages suffered by the public as a whole.

■ The discussion, thus far, has focused on whether Florida Seed has standing to assert antitrust claims. Frit likewise cannot bring this action, because stockholders do not have standing to bring an action on behalf of their subsidiary. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 710 (11th Cir.1984); *Harris v. Shell Oil Co.,* 371 F.Supp. 376, 377 (M.D.Ala.1974) ("The fact

that the sole stockholder may not recover damages under the antitrust laws for losses of his [or her] corporation had long ago been decided in this jurisdiction....") In *Harris*, the court explained the reasoning for denying standing to stockholders and related entities:

. The theory is that, if each creditor, shareholder or other person with some damage derived or reflecting from the damage to the corporation initially injured by the antitrust violations, had standing to assert treble-damage claims for such injuries, the court would be flooded with a multiplicity of suits, and the defendant would be subject to multiple liability for the same alleged wrongs.

*Id.* at 379.

▆ The plaintiffs, however, argue that Frit does not seek a double recovery or independent standing in its capacity as a shareholder but rather joins with Florida Seed in vindicating the alleged violations of the antitrust laws. The plaintiffs have not cited any authority for allowing Frit to unite with Florida Seed, nor has the court found any. Under the antitrust laws, Florida Seed is capable, in and of itself, of bringing an antitrust action, assuming of course that the standing requirements are satisfied. To the extent Frit seeks to join forces with Florida Seed, the court finds that the addition of Frit is merely duplicative. Therefore, Frit is not a proper party to the federal antitrust claims. Accordingly, Monsanto's motion to dismiss for lack of standing as to the plaintiffs' claims under § 2 of the Sherman Act and § 7 of the Clayton Act is due to be granted.

*II. State Law Claims*

▆ In granting Monsanto's motion to dismiss, the only claims now remaining are those brought pursuant to state law. Because diversity-of-citizenship jurisdiction is present in this case, the court will retain jurisdiction over the remaining causes of action.

### ORDER

For the reasons stated herein, it is CONSIDERED and ORDERED that defendant Monsanto Company's motion to dismiss the federal antitrust claims under § 2 of the

Sherman Act (Count I) and § 7 of the Clayton Act (Count II) be and the same is hereby GRANTED. The action will continue as to the state-law claims asserted in Counts III, IV, and V of the complaint.