**SERPA CORPORATION, Plaintiff,**

v.

**MCWANE, INC., Anaco, formerly known as Anaheim Foundry Company and, Tyler Pipe Industries, Inc., Defendants.**

**Civil Action No. 97–11515–NG.**

United States District Court, D. Massachusetts.

June 10, 1998.

---

Harold Brown, Law Office of Harold Brown, Boston, MA, Andrew S. Kasmen, Mitchell A. Kramer & Associates, Jenkintown, PA, Mitchell A. Kramer, Stephen G. Burns, Mitchell A. Kramer & Associates, Rydalntown, PA, for Serpa Corp., Plaintiff.

Robert D. Friedman, Perkins, Smith & Cohen, Boston, MA, for McWane, Inc, Anaco, Tyler Pipe Industries, Defendants.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

Plaintiff Serpa Corporation ("Serpa") brings this action against defendant corporations McWane ("McWane"), Anaco ("Anaco") and Tyler ("Tyler") alleging antitrust violations and injury stemming from the consolidation of several piping companies. The complaint charges the defendants with: vio-

lations of 15 U.S.C. § 15, Section 7 of the Clayton Act (Count One); violations of Section Two of the Sherman Act (Count Two); tortious interference with business advantage (Count Three); breach of the implied covenant of good faith and fair dealing (Count Four); tortious interference with contracts (Count Five); violations of M.G.L. ch. 93A (Count Six); and, breach of contract (Count Seven). Defendants have moved this court to dismiss Counts One through Six. Defendants' motion to dismiss is **ALLOWED** as to Counts One and Two and **DENIED** as to counts Three, Four, Five and Six.

## II. FACTS

Serpa is a manufacturer's representative for plumbing supplies. Between 1976 and 1996, Serpa was the exclusive distributor for certain Anaco plumbing supplies in New England. Anaco is a manufacturer of cast iron soil pipes ("CISP") and stainless steel no-hub joints known as "Fittings" and "Couplings." In combination, the products are used to transport human waste from buildings to sewer lines. Sales of the products were once made through exclusive sales representative firms, like Serpa. Sales representatives then sold the products to plumbing supply wholesalers.

Defendant Tyler was a former competitor of Anaco's in the CISP, Couplings and Fittings business. As both parties have noted, CISP, Couplings and Fittings are made to industry specifications and are virtually identical across companies; building supply wholesalers therefore select the piping products almost entirely on the basis of price. Serpa sold Anaco Couplings and Fittings and used its position as a regional representative to offer discounts to wholesalers within guidelines set by Anaco.

Serpa's complaint alleges that between November 1995 and August 1996, McWane acquired both its competitor, Tyler, and its supplier, Anaco.[1] McWane subsequently placed the marketing of Anaco products under the management of Tyler; on October 30, 1996, Anaco terminated Serpa as its New England sales representative. The plaintiff now argues that by terminating Serpa, defendants eliminated price competition in the Couplings and Fittings market and positioned themselves to raise prices in violation of state and federal laws designed to ensure competitive pricing and fair business practices. Defendants respond by arguing that Serpa lacks standing to assert federal antitrust protection and that further, plaintiff's state law claims should fail because they pivot on the federal antitrust action.

## III. MOTION TO DISMISS STANDARD

In considering a motion to dismiss, this Court must accept the well-pleaded factual averments and allegations of the non-moving party as true. *Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 23 (1st Cir.1990). All reasonable inferences are made in favor of the non-moving party. *Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 971 (1st Cir.1993).

## IV. ANTITRUST STANDING DISCUSSION

Section 4 of the Clayton Act, 15 U.S.C. § 15, grants a private cause of action for damages to "[a]ny person ... injured in business or property by reason of anything forbidden in the antitrust laws." An injured person may sue and recover treble damages and the costs of the suit, including reasonable attorney's fees. Notwithstanding the broad language of the statute, however, "the lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The Supreme Court has rejected the idea that any person whose injury was causally related to an antitrust violation has standing; indeed, only certain classes of plaintiffs may arrogate to themselves the enforcement powers once reserved for the Attorney General. *See* Julian O. von Kalinowski, *Antitrust Laws*

---

1. According to the defendants' answer, McWane is itself the majority shareholder of Ransom Industries, Inc. ("Ransom"). Tyler pipe is an unincorporated division of Ransom which owns certain assets of Tyler and 100% of the stock of Anaco.

*and Trade Regulation,* § 160.02, 2d ed., (1997).

■ Plaintiffs bringing suit under the Clayton Act must meet the standing requirements announced in *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and *Sullivan v. Tagliabue,* 25 F.3d 43, 45 (1st Cir.1994). The enumerated requirements include: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiffs alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages, and (6) the risk of duplicative recovery and complex apportionment of damages. *Sullivan,* 25 F.3d at 46, *citing Associated General,* 459 U.S. at 537–45, 103 S.Ct. 897. The *Associated General* factors were further defined in *Gallant v. BOC Group Inc.,* 886 F.Supp. 202 (D.Mass. 1995) which adopted a streamlined three-part standing inquiry focused on i) antitrust injury, ii) the directness of injury and causal nexus, and iii) the speculative nature of damages, duplicative recovery and complex apportionment of damages.[2] In this case, the plaintiff has failed to meet both the first and second factors, obviating the need to discuss the third prong of antitrust standing inquiry.

### 1. *Antitrust Injury*

■ In order to prevail under the Sherman Act, a plaintiff must show actual injury, "caused" by the antitrust violation. Simply asserting a place on the chain of causation—or losses owing to a merger—is not enough; the plaintiff's injury must amount to a restraint on trade in the relevant market. "In other words, a plaintiff must prove he [or she] is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry and be the target against which anticompetitive activity is directed." *Florida Seed Company, Inc. v. Monsanto Company,* 915

F.Supp. 1167 (M.D.Ala.1995) (internal citations omitted).

■ In addition, the case law indicates a pecking order of plaintiffs, favoring "competitors" and "consumers" as the preferred, though not exclusive, plaintiffs to allege antitrust injury. *See SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.,* 48 F.3d 39, 45. Cases brought by distributors, suppliers and commercial intermediaries (collectively referred to as "distributors") are presumptively disfavored because such parties are held not to have suffered directly because of the lessening of competition. *Id.* at 44. A leading treatise on the subject notes:

> [C]learly lacking antitrust injury, and thus having no standing, is the firm whose injury is caused merely by the efficiency effects of a vertical merger. For example, once a firm has integrated vertically into distribution by acquiring one or more existing distributors, it may reduce costs by dealing only with its wholly-owned distributors. A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product.

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 432–33 (1997 Supp.), *citing Alberta Gas Chems. v. E.I. Du Pont,* 826 F.2d 1235, 1244–1246 (3d Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *Bayou Bottling v. Dr. Pepper,* 543 F.Supp. 1255 (W.D.La.1982), *aff'd,* 725 F.2d 300 (5th Cir.1984) (plaintiff soft drink distributor did not suffer antitrust injury when it was prevented from acquiring a franchise due to defendant distributor's acquisition of franchise from defendant manufacturer); *Florida Seed,* 915 F.Supp. 1167 (plaintiff distributor of lawn and garden products did not have standing to sue manufacturer who acquired plaintiff's competitor and subsequently terminated plaintiff as distributor).

■ An intermediary distributor may only bring antitrust claims when it: i) is injured by the direct antitrust violation of a rival; ii) suffers directly as a result of illegal distribution restraints or, iii) qualifies as an exception.

---

**2.** The same tripartite analysis is applied in *Sullivan,* 25 F.3d at 47–51.

### a. *Direct antitrust violation of a rival*

■ The paradigmatic case of distributor standing is that of a plaintiff-distributor who operates at the same level of production as the defendant and is injured by a boycott or discriminatory pricing program aimed at driving the plaintiff out of the market, such as a car dealer denied parts by a parent or co-dealer. *See generally, Jay Edwards Inc. v. New England Toyota Distributor, Inc.,* 708 F.2d 814 (1st Cir.1983), *cert. denied,* 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983).[3] The mere fact that a plaintiff's rivals merge to the detriment of a competitor does not alone grant the competitor standing. *Cargill v. Monfort of Colo.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).[4] While a merger that actually causes prices to rise along a given distribution chain may occasionally confer standing on those in the chain, see infra section 1(c), the distributor's injuries are usually secondary to those of customers, who have suffered directly from the threat posed by increased prices or reduced selection.[5]

### b. *Illegal Distribution Restraints*

■ A distributor may also have standing to sue a manufacturer in the context of illegal distribution restraints. Distribution restraints directly limit the freedom of dealers to choose their own resale prices, territories, or customers, and may involve forcing intermediaries to participate in illegal conduct. A dealer terminated for failing to comply with the illegal restraint has standing to seek an injunction against the restraint or damages. *See Caribe BMW, Inc. v. BMW Aktiengesellschaft,* 19 F.3d 745 (1st Cir.1994) (car retailer's lost profits resulting from a maximum price fixing agreement between the retailer and its supplier constituted antitrust injury and provided the retailer with the requisite standing). Significantly, within this category, only those distributors whose prices are actually restrained have standing to sue.[6]

### c. *McCready*

A final exception to the bar against distributor standing may be available under *Blue*

---

**3.** In the automobile industry, such practices are regrettably so common that they have led to the Automobile Dealers' Day in Court Act, 15 U.S.C.A. § 1222.

**4.** As some commentators have remarked, however, "[s]tanding should generally be denied when the plaintiff does not operate at the same level as the defendant unless (i) their interests are very proximate, as demonstrated by the necessity of a market response by the plaintiff to the defendant's violation, (ii) the plaintiff is the injured party whose interest will most likely lead to a vindication of the public interest, and (iii) duplicative recoveries can be avoided." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* (Volume II), ¶ 360h(2), 207 (1995). *See e.g., Fischer v. NWA, Inc.,* 883 F.2d 594 (8th Cir. 1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990) (regional airline, which had an exclusive regional service agreement with a commercial airline, did not suffer antitrust injury when terminated because commercial airline acquired another airline and no longer needed regional airline's services); *Alberta Gas,* 826 F.2d 1235, (methanol producer had not suffered antitrust injury when a competitor acquired another corporation); *John Lenore v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir.1977) (beer distributor did not have standing to sue after the acquisition of one brewer by another, and the subsequent termination by the latter of the distributor); *G.K.A. Beverage Corp. v. Honickman,*

55 F.3d 762 (2d Cir.1995), *cert. denied,* 516 U.S. 944, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995) (plaintiff soft drink distributor did not suffer antitrust injury when its contract with bottler was terminated because bottler was driven out of business by defendant soft drink manufacturer).

**5.** *See Brian Clewer v. Pan Am. World Airways,* 674 F.Supp. 782 (C.D.Cal.1986), aff'd. 811 F.2d 1507 (9th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 288, 98 L.Ed.2d 248 (1987) (where an airline was ruined by an alleged predatory pricing scheme, ticketing suppliers to the victim do not have standing to sue the predators).

**6.** *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (denying standing to distributor that challenged a maximum resale price maintenance scheme that ARCO imposed on its dealers because the distributor was not a dealer whole prices were restrained). As the First Circuit recognized in *SAS:*

> ... there are patterns in the antitrust standing cases that offer considerable guidance. In general, such a supplier (including an employee who supplies labor) is held not to have suffered "antitrust injury"; while there may be a violation and causal harm to the supplier, the failed business is the immediate victim and the preferred plaintiff. *SAS,* 48 F.3d at 44 (internal citations omitted).

*Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). There, a health plan subscriber who was denied psychotherapy benefits provided by psychologists sued her insurer alleging a conspiracy to restrain competition in the psychotherapy market. Prior to McCready's challenge, it was the policy of Blue Shield of Virginia to refuse reimbursement of psychotherapy services provided by a psychologist while covering similar services offered by psychiatrists and physicians. McCready claimed that she had "been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers." *McCready*, 457 U.S. at 479, 102 S.Ct. 2540. The Court eschewed the defendant's claim that standing should be limited to psychologists, the targets of the alleged conspiracy. Instead, the Court held that the plaintiff had standing because denying reimbursement for the costs of the treatment was "the very means by which it is alleged that Blue Shield sought to achieve its illegal ends." *Id.*

*McCready* recognized that in certain circumstances, the elimination of an intermediary effectively destroys competition. In such cases, the distributor's knowledge or authority makes it an integral part of the competitive structure and its injury is heavily intertwined with the core injury perpetrated by antitrust violators. To deny standing to the intermediary is to sanction the diminution of competition where it matters the most.

The Court in *McCready* acknowledged that if an end-user is not the best protector of choice and price in the relevant market, competition may be effectively preserved by another kind of plaintiff. As the Court observed in *SAS*, "The most obvious reason for conferring standing on a second-best plaintiff is that, in some general category of cases, there may be no first best with the incentive or ability to sue." *SAS of Puerto Rico*, 48 F.3d at 45, *citing Associated General*, 459 U.S. at 542, 103 S.Ct. 897.

---

7. The streamlining of the two-party New England piping trade is not, of itself, a violation of

■ Whether or not *McCready* created a bona fide test of standing is the subject of some debate, *see Gallant*, 886 F.Supp. at 208, but it is largely irrelevant. *McCready*-like standing only applies when the flash point of competition lies outside of the customer or consumer. *McCready*, as well as the other vertical distributor exceptions, affirm that the intermediary must either be a damaged participant in the very market in which competition is diminished (that is, it must share characteristics of parties injured by horizontal conspiracies) or stand in the shoes of endusers who cannot or will not sue.

### 2. *Remoteness of Injury and Causal Nexus*

The private plaintiff must also show that the injury is not unduly remote from the violation, or duplicative of injury suffered by another. The "remoteness" of one plaintiff suggests the existence of a "superior" plaintiff for whom the antitrust injury was more direct. The principle is simple: "If the superior plaintiff has sued, additional suit by the remote plaintiff may be unnecessary, duplicative, or "excessive." If the "superior" plaintiff has not sued, one may doubt the existence of any antitrust violation at all." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, (Volume II), ¶ 360c(3), 196 (1995). Even if a distributor would otherwise qualify as a plaintiff under an exception, it will be denied standing when and if a preferred plaintiff is available to enforce the principles behind the Sherman Act.

### V. *APPLICATION TO SERPA*

The crux of the plaintiff's complaint is that its termination, as well as the merger of Anaco and Tyler, enabled defendants to set anticompetitive prices for Couplings and Fittings.

Ultimately, there is no dispute that the defendants' merger effectively reorganized Serpa out of the Couplings and Fittings market. Serpa was a classic distributor within a two company market that has been made redundant by McWane's restructuring.[7] As

---

the Sherman Act.

a consequence, Serpa's business has been diminished or eliminated because of the defendants' decision. The only question is how to characterize the role Serpa played as a distributor and the significance of its termination in order to determine whether it has standing.

■ I find that Serpa's alleged injuries are not antitrust injuries within the meaning of the phrase and are too remote to allow it to pursue its claims.

First, Serpa is plainly a "downsized" distributor. It is not challenging the practices of a rival, but rather the actions of an entity at a different level in the distribution chain in merging with another manufacturer and Serpa's competitor distributor.

Second, apart from the vague allegation of price increases, Serpa alleges no specific illegal restraint of trade.

Third, no exception applies. Nothing in the consolidation of Tyler and Anaco's piping distributors suggests that Serpa's termination was integrally related to an antitrust violation. Despite the fact that Serpa's business is threatened, its elimination was not a necessary instrument to effectuate the alleged conspiracy.[8] *McCready* exception is only available where the distributor is the flashpoint of competition and does not apply here because the plaintiff had only marginal pricing discretion prior to its elimination.

Finally, and most importantly, to the extent Serpa alleges an antitrust conspiracy exists resulting in higher prices,[9] the injured parties—those paying higher prices for standard piping products—can themselves sue to enforce the statute. Here, piping wholesalers have both the incentive and the opportunity to bring their own antitrust claims. If prices have in fact risen due to monopolistic practices in this market, we may expect relevant consumers to seek the protection of the statute by bringing their own suit.

Defendants' motion with respect to Count I is **ALLOWED.** Serpa's allegation of a "conspiracy" under Section 2 of the Sherman Act also fails because nothing in the record before me points to the existence of an illegal reorganization in violation of antitrust laws. Accordingly, defendants' motion with respect to Count II is **ALLOWED.**

■ Defendants have not met their burden on a motion to dismiss with respect to the state law claims. Plaintiff's complaint survives a motion to dismiss because it has sufficiently alleged each of the requisite elements of the state law cause of actions for tortious interference with business advantage, breach of the implied covenant of good faith and fair dealing, tortious interference with contracts and violations of Mass. General Law 93A. Since there is complete diversity among the parties and in light of the amount in controversy, Counts Three, Four, Five and Six are **DENIED.**

A status conference will be held on the remaining claims on Tuesday, June 9, 1998, at 3:30 p.m. in courtroom 4 on the 12th floor.

**SO ORDERED.**

---

**8.** Plaintiff points to *Engine Specialties, Inc. v. Bombardier Limited*, 605 F.2d 1 (1st Cir.1979) (Italian minicycle manufacture had standing to assert that anticompetitive scheme between world's largest minicycle maker and a local distributor violated plaintiffs' rights) to suggest that exclusive distributors have standing to sue under Section 4 of the Clayton Act. I find, however, that the plaintiff has misconstrued *Bombardier* which provides that sub-distributors lack standing. In the instant case, Serpa's place on a vertical chain makes it more akin to a sub-distributor than a competitor.

**9.** Even accepting plaintiff's allegation that prices for Couplings have risen 7% (see *Plaintiff's Memorandum of Law in Support of Its Opposition to Defendants' Motion to Dismiss* at 3), the price change amounts to a de minimus increase and is not evidence of above-market pricing sufficient to show antitrust injury.